**United States District Court**
For the Northern District of California

1
2
3
4 UNITED STATES DISTRICT COURT
5 NORTHERN DISTRICT OF CALIFORNIA
6

| | |
|---|---|
| 7 BARBARA SILVA, ET AL., | Case No. C-09-03649 JCS |
| 8    Plaintiffs, | |
| 9    v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Docket No. 47]** |
| 10 CITY OF SAN LEANDRO, ET AL., | |
| 11    Defendants. | |
| 12 _____ / | |

13 **I.      INTRODUCTION**

14        This civil rights action involves allegations that officers of the City of San Leandro Police

15 Department and the City of San Leandro violated Plaintiffs' constitutional rights when they entered

16 a residence occupied by Plaintiffs to perform a "welfare check" and shot and killed Plaintiff Silva's

17 dog.  Defendants bring a Motion for Summary Judgment or, in the Alternative, Summary

18 Adjudication ("the Motion") seeking dismissal of all of Plaintiffs' claims.  All parties have

19 consented to the jurisdiction of a United States magistrate judge, pursuant to 28 U.S.C. § 636(c).

20 The Court finds that the Motion is suitable for determination without oral argument, pursuant to

21 Civil Local Rule 7-1(b).  Accordingly, the motion hearing scheduled for October 8, 2010 at 1:30

22 p.m. is **vacated**.  The case management conference set for the same time shall remain on calendar.

23        For the reasons stated below, Defendants' Motion is GRANTED in part and DENIED in

24 part.

25 **II.      BACKGROUND**

26        **A.      Facts**

27        This action arises out of events that occurred on May 24, 2009 at a residence ("the

28 Residence") located at 632 Beatrice Street in San Leandro, California.  Joint Statement of

**United States District Court**
For the Northern District of California

1  Undisputed Material Facts Related to Defendants' Motion for Summary Judgment or, in the

2  Alternative, for Partial Summary Adjudication ("Joint Statement"), No. 1.  Plaintiff Bruce

3  Hemphill's grandmother had owned the Residence, but had passed away, and the Residence was in

4  probate.  *Id.*, No. 3.  Hemphill lived at the Residence pursuant to an agreement with his family that

5  he would maintain the Residence during the probate.  *Id.*, No 4.

6      At the time of the relevant events, the Residence was occupied by Bruce Hemphill, Barbara

7  Silva and Matthew Hoy.  *Id.*, Nos. 2, 7.  Silva lived at the Residence pursuant to an oral lease

8  agreement with Hemphill.  *Id.*, No. 5.  Matthew Hoy was Silva's boyfriend and also lived at the

9  Residence, in the room occupied by Silva.  *Id.*, No. 7.  In addition, Silva kept a 60-pound pit-bull

10  mix, named Boo-Boo, at the Residence with her.  *Id.*, No. 8.

11     On May 24, 2009, at approximately 4:18 a.m., the Alameda County Sheriff's Department

12  received an anonymous 911 call in which the caller stated that a female was overdosing on drugs

13  and turning blue at the Residence.  *Id.*, Nos. 9-10.  The Alameda County Sheriff's Department

14  immediately notified the San Leandro Police Department ("SLPD") of the 911 call.  *Id.*, No. 11.  In

15  response, the SLPD dispatch relayed the substance of the call to SLPD officers on patrol and

16  emergency medical personnel and requested that they respond.  *Id.*, No. 12.

17     Responding Officers Jason Bryan and Brian Buss, who were both on patrol at the time, in

18  separate patrol vehicles, were the first to arrive at the Residence.  *Id.*, Nos. 13-14.  Both were

19  wearing their police uniforms.  *Id.*, No. 15.  Upon their arrival, Officers Bryan and Buss proceeded

20  to the front door of the Residence.  *Id.*, No. 16.  The front door of the Residence is protected by a

21  locking, metal security gate.  *Id.*, No. 17.  Officer Bryan knocked and identified himself several

22  times.  *Id.*, No. 19.  At that point, Hemphill was in his bedroom and Silva and Hoy were in Silva's

23  bedroom.  *Id.*, No. 20.  Upon hearing the Officers' knocking, Hemphill came to the front door.  *Id.*,

24  No. 21.  The metal security gate obscured the Officers' view into the Residence.  *Id.*, No. 22.

25     The account of Officer Bryan about the events that followed differs from Plaintiffs' accounts.

26  Officer Bryan testified at his deposition that he told Hemphill that the officers were there because

27  they had received an anonymous 911 call stating that someone was overdosing on drugs inside.

28  Declaration of Matthew A. Lavrinets in Support of Defendants' Motion for Summary Judgment or,

1    in the Alternative, Summary Adjudication ("Lavrinets SJ Decl."), Ex. D (Bryan Depo.) at 15.

2    Officer Bryan testified that Hemphill told him that everybody was fine. *Id*.  Officer Bryan told

3    Hemphill that the officers needed to come inside to check nonetheless. *Id*. at 15-17.  According to

4    Bryan, Hemphill refused to let the officers in and appeared "agitated.". *Id*. at 16, 22.  Officer Bryan

5    then asked Hemphill if there was anyone in the house with him; Hemphill said there was and called

6    out the name "Matt." *Id*. at 17.  At that point a male appeared behind Hemphill.  *Id*. at 16-17.

7    Officer Bryan explained that although he could not see through the security door, even with his

8    flashlight, he heard male voices. *Id*. at 18.  According to Bryan, he heard the men saying that

9    everything was fine and mentioning that the second man's girlfriend was also in the house.  *Id*.

10   Bryan testified that Matt's girlfriend never came out, or at least, he never saw her. *Id*. at 18.

11   According to Bryan, while this exchange was occurring, there was a dog inside the house near the

12   door barking and growling and pushing on the screen door. *Id*. at 18, 20.   Bryan testified that:

13            [a]t that point I was trying to reason with Mr. Hemphill to just allow us to go in and just
              make sure everybody was ok.  And like I said, he was agitated.  He basically told me that he
14            was not going to let me in and he shut the door.

15   *Id*. at 21-22.

16           Hemphill testified at his deposition that when he opened the door, he saw two men on the

17   front porch and two men on the grass near the sidewalk, and that one of the men on the grass yelled

18   out that there had been a 911 call placed from Hemphill's residence and they needed access to the

19   home.  Declaration of Steven R. Yourke, Esq. in Support of Plaintiffs' Opposition to Defendant's

20   Motion for Summary Judgment ("Yourke Decl."), Ex. 3 (Hemphill Depo.) at 34.  Hemphill stated

21   that he was "confused" by this "because of the fact that there was no home phone in my

22   grandmother's house because we had it turned off within a week or so after she had passed."  *Id*.  He

23   testified that he responded as follows:

24            My response was . . .you must have the wrong house.  Because for one, there is no phone
              here at this house, which you – the officers or whatever it was – because I didn't know who it
25            was – because I didn't know who it was.  I just heard them say it out loud – was that the 911
              call was placed from my residence.  And I told them you guys must have the wrong address
26            or something because there's no one here in need of medical attention.  And then I said that
              if you'd like I can get the people that are here to come to the front door so they could verify
27            that everybody in the house is safe.  Would that be okay.  And I heard somebody say, yes,
              that would be fine.  So I turned back towards the – towards their bedroom direction and
28            yelled out loud, "Matt and Barbie, can you please come to the front door?" which they did.
              They both . . .stated that they were . . .fine.  And I turned to the front door and I said, well, is

3

United States District Court

For the Northern District of California

that all? . . .[and] the officers didn't say anything.  Nobody said anything.  So I assumed everything was fine and I closed the front door.

*Id.* at 35-36.  Hemphill further that "Matt came out first, but Barbie was a few feet behind him" and that both said out loud that they were fine.  *Id.* at 36.  According to Hemphill, Boo Boo was barking and so he asked Hoy to put the dog away.  *Id.*  Hemphill stated that Hoy then took Boo Boo to Silva's bedroom and closed the door.  *Id.*

Silva testified at her deposition that after she heard her dog barking and the doorbell ring, Hemphill knocked on the bedroom door and asked Silva and Hemphill to come to the door because the police were there.   Yourke Decl., Ex. 1 (Silva Depo.) at 57.  She said that Hoy went with Hemphill, that Boo Boo also left the room and that she followed, about two minutes later, after putting her pants on.  *Id.*   According to Silva, she spoke to the officers and assured them that she was fine and only went back to bed after she asked the officers if she could do so, and they replied that she could.  *Id.* at 57-61.

It is undisputed that Hemphill did not open or unlock the front door security gate and that Officer Bryan felt that Hemphill's refusal to admit the officers to conduct a welfare check was suspicious.  Joint Statement, Nos. 33-34.  In Officer Bryan's experience, acquaintances of a person overdosing on drugs will often assume a person's life is not at risk and will prefer to not involve police or emergency personnel for fear that they will be held criminally liable for their own use of drugs.  *Id.*, No. 36.

Therefore, Officer Bryan determined that the officers needed to enter the Residence.  *Id.*, Nos. 37-38.  Officer Bryan contacted dispatch and requested assistance from additional SLPD officers and the following officers responded: Liaquat Khan, Matthew Costa, Daniel Sellers, Robert McManus, Michael Benz, Dennis Mally, Jason Fletcher and Suzanne Huckaby.  *Id.*, Nos. 39-40.  As additional officers began to arrive on the scene, Officer Bryan and other officers conferred regarding the safest method to gain entry into the home, and conducted related investigation into other routes of entry besides the front door, which was blocked by a security gate.  *Id.*, No. 41.  The officers felt that time was of the essence and that they needed to gain entry into the Residence as soon as possible due to the emergency nature of the situation.  *Id.*, No. 42.

United States District Court

For the Northern District of California

As part of the efforts to gain entry to the Residence, Officer Costa looked over a side fence of the Residence and saw a side door to the garage of the Residence that was ajar. *Id*., No. 43. Officer Costa proceeded over the fence with the intent of securing the side door so that the officers could use it as an entry point to gain access to the Residence to perform a welfare check. *Id*., No. 44. When Officer Costa arrived at the side door, he was met by Hemphill, who attempted to shut the side door. *Id*., No. 45. However, Officer prevented Hemphill from closing the door by placing his foot in the door. *Id*., No. 46. Officer Costa then ordered Hemphill to come out of the Residence. *Id*., No. 47. Hemphill complied and Officer placed Hemphill in handcuffs, with his arms behind his back. *Id*., No. 48. Officer Costa then called for assistance in continuing to detain Hemphill so that Officer Costa could remain at the side door and prevent anyone else inside the Residence from closing it. *Id*., No. 49.

Officer Khan heard Officer Costa's request for assistance and proceeded to where Officer Costa and Hemphill were standing. *Id*., No. 50. Officer Kahan took hold of Hemphill's arm and led him to the front of the Residence, where multiple police cars were parked. *Id*., No. 51. As Officer Khan was leading Mr. Hemphill to the front of the Residence, Officer Khan felt Hemphill begin to resist his grip on Hemphill's arm. *Id*., No. 52. Officer Khan felt that Hemphill was about to attempt to run away from him, so Officer Khan intensified his grip on Hemphill's arm and forcefully directed him to the hood of a nearby police car. *Id*., No. 53. Officer Khan perceived Hemphill as being much larger than him; Hemphill is five foot eleven inches tall and weighs 185 pounds, while Office Khan is five foot four inches tall and weighs 150 pounds. *Id*., No. 54; Reply at 6 n. 2 (clarifying that Hemphill is not five foot four inches, as stated in the Joint Statement but rather, five foot eleven, citing Hemphill's own deposition testimony). Upon reaching the hood of the police car, Officer Khan placed the front of Hemphill's upper body on the hood of the police car. *Id*., No. 55. Officer Fletcher assisted Officer Khan in placing Hemphill over the hood of the car. *Id.,* No. 56. Officer Khan then placed Hemphill in the rear seat of the police car. *Id*., No. 57.

The evidence is disputed as to whether Hemphill resisted Officer Khan as he led him from the side of the Residence to the hood of the patrol car and then into the back seat of the car. Officer Khan stated in a sworn declaration that Hemphill attempted to resist his grip and later "struggl[ed][

United States District Court
For the Northern District of California

1  with him as he moved him away from the side of the house."  Declaration of Officer Liaquat Khan in

2  Support of Defedants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication

3  ("Khan Decl."), ¶¶ 8-9.  Hemphill, on the other hand, testified at his deposition that he complied

4  with the Officers order and did not flex his muscles as Khan stated.  Yourke Decl., Ex. 3 (Hemphill

5  Depo.) at 71.

6       Subsequently, a group of officers entered the Residence through the side door.  Lavrinets

7  Decl., Ex. D (Bryan Depo.) at 28.  There is conflicting evidence in the record as to how the decision

8  was made to enter in this manner.  According to Officer Bryan, Sergeant McManus – one of the

9  officers who had  responded to Officer Bryan's call for additional back-up – was the officer who

10  made the decision for a "stack"[1] of officer to enter through the side garage door.  *Id*. at 28.   Officer

11  McManus, on the other hand, testified that he did not authorize or coordinate the stack and did not

12  know who gave the order to form a stack.  *Id*., Ex. G (McManus Depo.) at 20.  Rather, he testified

13  that he was still in the front of the house coordinating other emergency personnel when he saw five

14  or six officers, 40 or 50 feet away from him, begin entry into the house through the side of the

15  garage.  *Id*. at 21.  Hemphill offered yet another account, testifying at his deposition that Sergeant

16  McManus instructed his officers to enter through the side garage door after asking Hemphill the

17  easiest way to get into the house.  Yourke Decl., Ex. 3 (Hemphill Depo.) at 55.  According to

18  Hemphill, he told Sergeant McManus to enter through the garage  side door, which was open, so that

19  it would not be necessary to kick down the front door, which was still locked.  *Id*.

20       Although it is unclear who made the initial decision to enter through the side garage door, it

21  is undisputed that the decision to form a stack was made at approximately 4:34 a.m.  Joint

22  Statement, No. 59.  The stack included Officers Costa, Sellers, McManus, Bryan, Buss, Fletcher and

23  Mally.  *Id*., No. 60.  There is conflicting evidence about the events that followed.  Officers Bryan,

24  Costa and McManus testified that when they entered the garage, they loudly identified themselves as

25  San Leandro Police officers and called for everyone in the house to come out with their hands up.

26  *See* Lavrinets Decl., Ex. D (Bryan Depo.) at 29-30, Ex. F (Costa Depo.) at 45-46, Ex. G (McManus

27

28      [1]According to Officer Bryan, a "stack" of officers is a single-file line of officers.  Lavrinets Decl., Ex. D (Bryan Depo.) at 28.

Depo.) at 26.  The officers further testified that they entered the kitchen after they received no response and then ordered the occupants to come out again, calling Hoy by name.  *Id.*  (Plaintiffs do not dispute that Officer Bryan called Hoy by name.  *See* Lavrinets Decl., Ex. C (Hoy Depo.) at 46.)  According to the officers, they again received no response and they proceeded to the living room.  Lavrinets Decl., Ex. D (Bryan Depo.) at 29-31, Ex. F (Costa Depo.) at 49-50, Ex. G (McManus Depo.) at 50-51.

Officer Bryan testified that he could not recall whether any order was given prior to entering the Residence to secure Silva's dog.  Lavrinets Decl., Ex. D (Bryan Depo.) at 30.  Officers Costa and Sellers, however, testified that no instruction was given to secure the dog.  Lavrinets Decl., Ex. F (Costa Depo.) at 67; Yourke Decl., Ex. 4 (Sellers Depo.) at 89.  Similarly, Sergeant McManus testified that he did not recall Officer Bryan informing him that there was an aggressive pit bull inside the residence.  Lavrinets Decl., Ex. G at 50.

Officer Bryan testified that after he and Officer Sellers arrived in the living room, Hoy came into the living room and Officer Sellers ordered him to put his hands up, and then to get down on the ground.  Lavrinets Decl., Ex. D (Bryan Depo.) at 32.  Officer Bryan further testified that Hoy complied with those orders.  *Id*.  Officer Sellers testified that at the same time, he had his gun and flashlight trained on the hallway and that he could hear a grunt or growl coming from that direction.  Lavrinets Decl., Ex. I (Sellers Depo.) at 75.  According to Officer Sellers, a dog came around the corner at that point, "sprinting" straight at him, with its ears back and its teeth bared.  *Id*.  Officer Sellers concluded that the dog posed an "immediate threat" to him and was attacking him.  *Id*.  At this point, Officer Sellers testified, Hoy was already on the floor.  *Id*. at 77.  Officer Sellers was reluctant to shoot, however, for fear of hitting Hoy or another officer.  *Id*.  When the dog was five feet away, Officer Sellers said, he fired one round at it.  *Id*.

Hoy offered a different account, testifying that when the officers were outside the garage, he "heard somebody from way on the other side of the house yell, 'Matt . . . come out.  I just need to talk to you.  You're not in any trouble.  Just come out.  I got to ask you a couple questions.'"  Yourke Decl., Ex. 2 (Hoy Depo.) at 46.  According to Hoy, in response he put his pants on and came out of the bedroom to find five officers in the living room, guns drawn, yelling, "[p]ut your fucking

**United States District Court**

For the Northern District of California

1   hands in the air.  Put your hands in the air."  *Id*. at 47- 48.  Hoy further testified that Boo Boo

2   followed him out of the bedroom, at which point Barbara said "Matt, Boo Boo's following you" and

3   Hoy gestured to the officer to wait while he restrained the dog.  *Id*. at 56-57.  According to Hoy, just

4   as he reached down to do so, an officer shot Boo Boo.  *Id*. at 57.  Hoy testified that prior to being

5   shot, Boo Boo was not barking and that he was just coming around the corner from the hallway

6   when he was shot.  *Id*.

7       The shot fired by Officer Sellers hit Boo Boo, who stopped in his tracks and retreated to

8   Silva's bedroom.  Joint Statement, No. 76.  The officers then continued to perform their welfare

9   check but did not find any female overdosing, as had been reported.  *Id*., Nos. 78, 83.  Both Hoy and

10  Sillva were placed in handcuffs and escorted to separate patrol cars.  *Id*., Nos. 79-82.  Boo Boo was

11  placed in a "comealong" by Officer Costa and led to Officer Huckaby's car.  Joint Statement, No.

12  84.  At 4:45 a.m., Officer Huckaby drove Boo Boo to the 24-hour emergency vet for treatment but

13  Boo Boo ultimately died.  *Id*., Nos. 85, 87.

14      Silva and Hoy were released after they had signed statements that were prepared by Officers

15  Costa (Hoy's statement) and Buss (Silva's statement).  *Id*., No. 88.  The statement for Silva was

16  signed by Silva and states as follows:

17      Officer Buss is writing this statement for me.  Tonight I was at home with my boyfriend
        Matthew.  About 4:00 AM I heard somebody call Matt's name and he walked out of the
18      bedroom.  My dog Boo Boo followed Matt to the door.  I saw a bunch of lights come on and
        I heard somebody tell Matt to show his hands and to get on the ground.  I had no idea what
19      was going on.  I didn't know BJ [and Matt][2] didn't answer the door when the cops were at it.
        I sat up from bed and saw Boo Boo run out of the bedroom door.  I stayed in the bedroom
20      because I didn't know what to do. I froze for a minute.  I heard a loud pop, and Boo Boo ran
        back into the bedroom.  Right before Matt was called out of the bedroom I was sleeping.  I
21      woke up as he jumped up out of bed.  I know the police had to shoot Boo Boo because they
        didn't know Boo Boo is a sweet dog.  I understand why they did what they did because he
22      came running out and he's a big dog. [When I heard the police tell Matt to put his hands on
        his][3] head When I heard you guys tell Matt to put his hands on his head I knew it was the
23      police.  I told Boo Boo no, don't run out but I spoil him and he doesn't listen very well.  Boo
        Boo ran out of the bedroom.  I know you guys did the right thing and not go over your
24      boundaries.  I know Boo Boo isn't trained well enough to stay or sit when I tell him to.

25  ─────────────────

26      [2]These words are crossed out; next to the crossed out words are what appear to be the initials
    "BJS."  Silva testified at her deposition that she did not cross anything out in the statement, though she
    might have initialed the cross-outs "to get out of there."  Yourke Decl., Ex. 1 (Silva Depo.) at 155.

27
        [3]These words are crossed out; next to the crossed out words are what appear to be the initials
28  "BJS."

**United States District Court**
For the Northern District of California

1    This is a true statement.

2  Lavrinets Decl., Ex. L (Silva Statement).  Officer Buss testified that the statement accurately reflects

3  the account that Silva gave him of what had occurred that night.  Lavrinets Decl., Ex. E (Buss

4  Depo.) at 47.  Silva testified at her deposition, however, that the statement is false and moreover,

5  that she signed it without reading it because she was in a hurry to get out of the car and make sure

6  her dog was okay.  Yourke Decl., Ex. 1 (Silva Depo.) at 146 - 157.

7    The statement for Hoy was written by Officer Costa and signed by Hoy.  Lavrinets Decl., Ex.

8  K (Hoy Statement).  It states as follows:

9    On 05-24-09 at 0415 AM I was at home in bed with my girlfriend Barbara.  I heard the
     doorbell ring and my roommate "BJ" called my name.  I went to the door and saw a police
10   officer there.  BJ was at the door with me and my dog was there too.  The police asked if
     someone had been arguing.  I didn't know what they were talking about so I closed the door
11   and went back to bed.  A few minutes later, I heard someone calling my name.  They said
     they were the police.  I thought the police had left and BJ was messing around with me.  I
12   stayed in bed with Barbara and the dog.  Again I heard my name and I was told to come out
     of my room.  As I came out of the room, I turned the corner and saw a bunch of uniformed
13   police in the living room.  I was told to get on the ground and I did.  Then my dog ran out of
     the bedroom at the officers.  I heard a gunshot and saw the dog run back.  I stayed on the
14   ground in the living room.  The police handcuffed me and took me outside to a police car.
     This is the truth to the best of my knowledge.

15

16  *Id.*  Officer Costa testified that he read the statement accurately to Hoy before Hoy signed it.

17  Lavrinets Decl., Ex. F (Costa Decl.) at 15.  However, Hoy testified at his deposition that although he

18  had some memory of an officer reading a statement to him, it could not have been the statement

19  quoted above because that statement is false.  Yourke Decl., Ex. 2 at 99-103.  Hoy also testified that

20  he signed the statement without reading it and that at the time, it didn't really matter to him because

21  he had been told that he would be free to go once he signed the statement and he wanted to check on

22  the dog.  *Id.* at 99-100.

23    In the meantime, Hemphill had been taken by Officer Khan to the SLPD station for booking.

24  Joint Statement, No. 90.  Officer Khan interviewed Hemphill about the events of that night.  *Id.*, No.

25  91.  He prepared the following statement, which carries Hemphill's signature:

26    Today, 5/24/09 around 4:00 A.M., I was at my house, in my bedroom, going over some
     paperwork.  I have been under some stress over some family matters.  At this time I heard a

27

28

**United States District Court**
For the Northern District of California

knock at my front door.  I answered the front door [ ][4] and saw [ ][5] two police officers.  One of the officers said they were there because they got a medical call of someone overdosing at the house.

I knew as a fact my two roommates at the house were okay and not overdosing.

I told the officers no one was in need of help.  The officers asked if they could come in and I told them no.  I told them no because there was no medical emergency.

When I closed the door, I heard the officers knocking at the door.  I also heard people in my back yard.

A short while (I don't remember the time frame) I opened the side door.  I was met by some offices again.  I was [taken][6] detained in hand cuffs.

I was then escorted by another officer away from my house.  As I was leaving I tightened my muscle because I didn't know what was going on and because of my stress.

I had no intention of delaying the officers in any way.

This is a true statement.

Lavrinets Decl., Ex. J (Hemphill Statement).

Officer Khan states in his declaration that this statement is based on what Hemphill told him during the interview at the station and that Hemphill reviewed the statement before signing it.  Khan Decl., ¶¶ 11-13.  At his deposition, however, Hemphill testified that a number of the statements in the written account were false and that he had not actually read the statement.  Yourke Decl., Ex. 3 (Hemphill Depo.) at 73.  Rather, Hemphill stated that he had signed the statement after Officer Khan read something to him that he *represented* to be the written statement.  *Id*.  Hemphill noted that "he could have told me a total different story than what he wrote."  *Id*.

### C.    The Complaint

In the Complaint, Plaintiffs assert claims under 42 U.S.C. § 1983 against the following Defendants: 1) City of San Leandro; 2) San Leandro Chief of Police Ian Willis, in his official capacity; 3) Sergeant Robert McManus; 4) Officer Brian Buss; 5) Officer Daniel Sellers; 6) Officer Michael Benz; 7) Officer Matthew Costa; 8) Officer Liaquat Khan; 9) Officer Dennis Mally; 10)

_____

[4]A letter or letters are crossed out here; next to the cross-out are initials that are not legible.

[5]A letter or letters are crossed out here; next to the cross-out are initials that are not legible.

[6]This word is crossed out; next to the cross-out are initials that are not legible.

Officer Jason Fletcher; and 11) Officer Suzanne Huckaby.  Plaintiffs assert three claims.

In Claim One, Plaintiffs assert that their Fourth and Fourteenth Amendment rights to be free of unreasonable searches and seizures were violated.  Within this claim, Plaintiffs assert that: 1) each of the Defendant police officers arrested or detained each of the Plaintiffs without probable cause; 2) Officer Khan used excessive force against Plaintiff Hemphill when he arrested Hemphill; and 3) each of the Defendant police officers, including Sergeant McManus, violated Plaintiffs' Fourth Amendment rights by entering the Residence without a warrant or lawful justification.

In Claim Two, Plaintiff Silva asserts that Officer Sellers violated her Fifth and Fourteenth Amendment rights to due process when he deliberately shot and killed Boo Boo without due process or lawful excuse or justification.

In Claim Three, Plaintiffs assert claims against the City of San Leandro and the Police Chief, Ian Willis, on the basis that these defendants were the proximate cause of Plaintiffs' injury because they failed to adequately train and supervise their officers.

**D.     The Motion**

In the Motion, Defendants seek summary judgment on the following grounds:

1)   Plaintiffs' claims under the Fourteenth Amendment, based on their alleged deprivation of substantive due process, fail as to all Defendants because the applicable amendment is the Fourth Amendment, not the Fourteenth Amendment.

2)   Defendants' entry into the Residence and arrest of Plaintiffs did not violate Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures because of the existence of exigent circumstances, which allows officers to enter a residence without a search warrant in emergency situations and to briefly detain residents while a search is being performed.   Defendants further assert that even if the search was unreasonable, the Defendant officers are entitled to qualified immunity because the officers had a reasonable belief that they were acting lawfully.

3)   Defendants' arrest of Plaintiff Hemphill, as a matter of law, did not violate the Fourth Amendment because the minimal use of force by Officer Khan was reasonable and, in any event, Officer Khan is entitled to qualified immunity as to this claim.

11

**United States District Court**
For the Northern District of California

4)    Defendants' detention of Plaintiffs Hoy and Silva, as a matter of law, did not violate the Fourth Amendment because exigent circumstances permitted the Officers to enter the house and briefly detain Hoy and Silva in order to conduct the search.

5)    Defendant Sellers' shooting of Plaintiff Silva's dog, as a matter of law, did not violate the Fifth Amendment because none of the defendants are federal actors; nor did it violate the Fourteenth Amendments because a deprivation of property does not violate the Fourteenth Amendment's procedural due process right.

6)    Plaintiffs, as a matter of law, cannot establish the liability of the City of San Leandro and Police Chief Ian Willis because there is no evidence of a widespread custom or practice, as required to establish municipal liability under *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978).

In their Opposition, Plaintiffs assert that there are four issues that must go to trial because there are of disputed questions of material fact:

1)    Whether Defendants' entry into the home was reasonable; Plaintiffs point to evidence which, indicating that after Hemphill was arrested, Silva and Hoy were not warned that the police were entering the house, were not warned to secure the dog and were never asked to simply open the front door and allow the police to enter.

2)    Whether the shooting of the dog was reasonable; Plaintiffs point to evidence that Boo Boo did not attack the police and posed no serious threat to them

3)    Whether the arrest and use of force against Hemphill by Officers Khan and Fletcher was reasonable;  Plaintiffs point to evidence that Officers Khan and Fletcher "body-slammed" Hemphill to the hood of the car even though he was not resisting arrest;

4)    whether the detention of Hoy was reasonable; Plaintiffs point to evidence that Hoy did not resist arrest or obstruct the police in conducting their search in any way.

Plaintiffs concede that the claim based on the shooting of Boo Boo should have been pleaded under the Fourth Amendment rather than the Fifth and Fourteenth Amendments and request leave to amend the Complaint to assert the claim under the Fourth Amendment.  Plaintiffs cite to *San Jose Chapter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir. 2005) in

United States District Court

For the Northern District of California

1   support of their assertion that the shooting of a pet dog by police may violate the Fourth

2   Amendment.

3          In their Reply brief, Defendants reiterate the arguments in the Motion.  With respect to the

4   Fourth Amendment claim that Plaintiffs seek to assert against Officer Sellers based on the shooting

5   of Boo Boo, Defendants argue that the claim should be dismissed because the facts here are

6   distinguishable from those in the *Hells Angels* decision and therefore, that Defendants are entitled to

7   qualified immunity on this claim.

8   **III.    ANALYSIS**

9          **A.    Legal Standard under Rule 56(c)**

10         Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be

11  rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

12  together with affidavits, if any, show that there are no genuine issues as to any material fact and that

13  the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine"

14  issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for

15  the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16          In order to prevail, a party moving for summary judgment must show the absence of a

17  genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or

18  to a defense on which the nonmoving party will bear the burden of persuasion at trial.  *Celotex Corp.*

19  *v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210

20  F.3d 1099 (9th Cir. 2000).  Once the movant has made this showing, the burden shifts to the party

21  opposing summary judgment to "designate specific facts showing there is a genuine issue for trial."

22  *Celotex*, 477 U.S. at 323.  To establish a "genuine" issue of fact when opposing summary judgment,

23  a plaintiff must "produce at least some significant probative evidence tending to support" the

24  allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

25         **B.    Claims Dismissed on the Basis that Plaintiffs Have Not Opposed Summary
26                 Judgment and/or Cited to Evidence in Support of Them**

27              **1.    *Monell* Claims**

28  In the Motion, Defendants argued that the claims against Chief Ian Willis and the City of San

Leandro should be dismissed because Plaintiffs have pointed to no evidence of a policy or practice on the part of the City that would allow for the imposition of municipal liability.  The Court agrees.

Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its employees on a theory of respondeat superior.  *Monell*, 436 U.S. at 691.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  A plaintiff seeking to establish municipal liability under section 1983 may do so in one of three ways: 1) the plaintiff may demonstrate that a municipal employee committed the alleged constitutional violation "pursuant to a formal governmental policy or longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" 2) the plaintiff may demonstrate that the individual who committed the constitutional violation was an official with "final policy-making authority and that the challenged action itself thus constituted an act of official government policy;" or 3) the plaintiff may demonstrate that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, Plaintiffs did not address in their Opposition brief Defendants' assertion that the claims against the City of San Leandro and the police chief fail as a matter of law.  Further, there is no evidence in the record that the alleged violations were either committed by an individual with final policy-making authority or ratified by such an individual.  Nor is there any evidence of a policy or custom to which the relevant conduct of the Defendant officers can be attributed.  Therefore, Defendants' request for entry of summary judgment on the claims against the City of San Leandro and the police chief is granted.

### 2.      Officer Huckaby

Defendants assert that Plaintiffs' claims as to Officer Huckaby should be dismissed because the only evidence of her involvement in the relevant events is that she drove Boo Boo to the emergency veterinarian after he was shot.  The Court agrees.  The undisputed evidence shows that Huckaby was not involved in the entry into the Residence or the arrest or detention of any of its

1   residents.  Accordingly, all of Plaintiffs' claims fail as to Officer Huckaby.

2          **3.**       **Fourteenth Amendment Claims**

3        Defendants seek summary judgment as to all of Plaintiffs' claims under the Fourteenth

4   Amendment on the basis that the Fourteenth Amendment due process clause applies only to federal

5   actors and none of the named defendants is a federal actor.  Plaintiffs do not address this argument in

6   their Opposition brief, implicitly conceding that these claims fail.  Accordingly, the Court grants

7   Defendants' request for summary judgment as to all of Plaintiffs' Fourteenth Amendment claims.

8         **C.**       **Fourth Amendment Claim Based on Allegedly Illegal Entry**

9        Defendants argue that the Court should enter summary judgment in their favor on all of

10  Plaintiffs' Fourth Amendment claims based on the Defendant Officers' allegedly unreasonable entry

11  into the Residence, asserting that the undisputed evidence establishes, as a matter of law, that

12  exigent circumstances justified the Officers' conduct.  Defendants further assert that even if it cannot

13  be determined as a matter of law whether the Officers acted reasonably, they are nonetheless entitled

14  to qualified immunity as to this claim because their conduct did not violate a clearly established

15  right.  The Court concludes that there are factual disputes that preclude summary judgment on both

16  grounds.

17        **1.**       **Whether Exigent Circumstances Justified the Warrantless Entry**

18       The Fourth Amendment guarantees: "The right of the people to be secure in their persons,

19  houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

20  Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

21  describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.

22  The purpose of this amendment is to "safeguard the privacy and security of individuals against

23  arbitrary invasions by governmental officials."  *Camara v. Municipal Court of the City and County*

24  *of San Francisco*, 387 U.S. 523, 528 (1967).  Thus, it is well-established that "except in certain

25  carefully defined classes of cases, a search of private property without proper consent is

26  'unreasonable' unless it has been authorized by a valid search warrant.'"  *Michigan v. Tyler*, 436 U.S.

27  499, 506 (1978) (quoting *Camara v. City and County of San Francisco*, 387 U.S. 523, 528-529

28  (1967)).

**United States District Court**
For the Northern District of California

An exception to the search warrant requirement arises in the case of exigent or emergency circumstances in which police officers reasonably believe "that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). The Ninth Circuit has adopted a two-part test for determining whether the emergency exception applies, which asks "whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *U.S. v. Snipe*, 515 F.3d 947, 951 (9th Cir. 2008). "When a government agent enters a home without a warrant, 'the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.'" *U.S. v. Davis*, 290 F.3d 1239, 1242 (10th Cir. 2002) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984)).

There is no bright-line rule as to whether a 911 call reporting that an occupant of a residence is in danger is sufficient to give rise to exigent circumstances. *See, e.g., U.S. v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004); *U.S. v. Davis*, 290 F.3d 1239, 1242 (10th Cir. 2002). For example, in *Brooks*, the court of appeals affirmed the district court's holding, on a motion to suppress, that an officer who entered the defendant's hotel room without a warrant did not violate the Fourth Amendment because the officer reasonably believed that a woman inside was in serious danger. *Id*. The court explained its holding as follows:

> The issue before us is whether the 911 call alerting police to a perceived domestic abuse and the corroborating facts known to Perez disclosed dangers creating an exigency that justified entry into Brooks's hotel room without a warrant. Many of the same facts that showed probable cause to suspect evidence of crime are also relevant to show Perez's exigent need to enter. Police received an emergency call for aid. Perez talked to the hotel guest who feared an assault was occurring in Brooks's room, and Perez confirmed by Brooks' statement that a woman was in the room. When Brooks opened the door, he admitted that the woman had been "loud." Perez saw the hotel room in disarray. No woman was in sight. Perez's entering the room was justified by an objectively reasonable belief that a woman might be injured and entry was "necessary to prevent physical harm" to her.

*Id*. at 1135-1136. The Court went on to reject the defendant's argument that the officer could have simply asked the woman to come out into the hall to be interviewed, noting that "[t]he Supreme Court has 'repeatedly refused to declare that only the "least intrusive" search practicable can be reasonable under the Fourth Amendment.'" *Id*. (citations omitted).

United States District Court

For the Northern District of California

In contrast, in *U.S. v. Davis*, the Tenth Circuit affirmed the district court's order granting a motion to suppress evidence that had been seized during a warrantless search, rejecting the government's assertion that the officers had not violated the defendant's Fourth Amendment rights when they entered his home without a search warrant because of exigent circumstances. 290 F.3d at 1244. In that case, the officers had received a dispatcher's report of a possible domestic disturbance at a residence that was known to the officers to be the home of Jason Davis and Desiree Coleman. *Id*. at 1240. When the officers arrived at the residence, they heard no noise and saw no sign of a disturbance. *Id*. Subsequently, Davis appeared at the door, with bloodshot eyes and alcohol on his breath. *Id*. He told the officers that he had been disciplining his child and that Ms. Coleman was out of town. *Id*. At this point, however, Ms. Coleman appeared. *Id*. at 1241. She wrapped her arms around Davis's waist and said that the two had been arguing. *Id*. Davis, however, was obstructing the officers' view of Coleman and preventing them from talking to her, while at the same time he was attempting to close the door. *Id*. At that point, the officers told Davis that they were coming in to check on Ms. Coleman. *Id*. Davis then quickly retreated to the back of the house and returned with a child in his arms. *Id*. The officers entered the house and observed signs of marijuana use, which they cited in support of a subsequent application for a search warrant. *Id*.

The defendant in *Davis* brought a motion to suppress the evidence that was uncovered in the subsequent search and the government opposed it, asserting that exigent circumstances justified the first (warrantless) entry. *Id*. In rejecting the government's argument, the court stated as follows:

> There was no evidence introduced that indicated the officers believed Mr. Davis had a reputation for violence. Nor had he displayed a threatening or aggressive manner when he initially contacted the officers. It is true he lied about Ms. Coleman's whereabouts, but any concern that lie might have effected was allayed when she appeared without any signs of harm. Moreover, the only manifestation of resistance displayed by Mr. Davis was his insistence upon keeping the officers outside. As the district court noted, even Ms. Coleman, "the suspected victim[,] was trying to prevent" the officers from entering Mr. Davis' residence. *United States v. Davis*, No. 01-40036-01-RDR, 2001 WL 1013313, at *4 (D.Kan. Aug.7, 2001). The court therefore logically concluded the officers "[o]bviously ... could [have] check[ed] her condition without entering the home." *Id*. Moreover, as stated in Mr. Davis' brief, "Parsons knew Davis had children, so his withdrawal from police presence should have been wholly unthreatening."

*Id*. at 1243. For these reasons, the court granted the motion to suppress. *Id*.

United States District Court

For the Northern District of California

1    In this case, the Court concludes that the evidence in the record does not provide a sufficient

2    basis to conclude that exigent circumstances existed *as a matter of law*. *See Sharrar v. Felsing*, 128

3    F.3d 810 (3d Cir. 1997) (holding that the district court had erred in holding, on summary judgment,

4    that exigent circumstances justified warrantless entry because there were disputed questions of fact

5    relating to circumstances).  While it is undisputed that a 911 call had been received reporting that an

6    individual was overdosing inside, it is also undisputed that the call was anonymous, in contrast with

7    the facts of *Brooks*, in which the officer actually spoke with the individual who had placed the

8    emergency call.  Further, while Defendants cite to Hemphill's conduct when he answered the door as

9    a separate basis for concern, the accounts of what occurred when the Officers first spoke to Hemphill

10   are widely divergent.  Hemphill testified that he offered to call all of the occupants to the front door

11   so that the officers could see that no one was in danger and that in fact, he did call his roommates,

12   who came to the front door while he was talking to the officers.  He further testified that he closed

13   the front door because he believed that the matter had been resolved, not because he was refusing the

14   police entry.  In contrast, the officers testified that Silva did not come to the door, that they could not

15   see through the security grate, that Hemphill acted suspiciously and that he slammed the door on the

16   officers, refusing to permit them to enter the house.

17   In short, in light of the factual disputes relating to the circumstances under which the officers

18   entered the Residence, the Court finds that the question of whether there were exigent circumstances

19   cannot be resolved on summary judgment.

20          **2.      Whether Defendants Are Entitled to Qualified Immunity on this Claim**

21   Under the doctrine of qualified immunity, even if a constitutional violation occurred,

22   governmental officials are immune if their conduct "does not violate clearly established statutory or

23   constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457

24   U.S. 800, 818 (1982).  To determine whether a defendant is entitled to qualified immunity, courts

25   must first ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts

26   alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194,

27   200 (2001).  If not, the qualified immunity analysis ends here. *Id.* at 201.  On the other hand, "if a

28   violation could be made out on a favorable view of the parties' submissions, the next sequential step

18

United States District Court

For the Northern District of California

1  is to ask whether the right was clearly established." *Id*.[7]  The inquiry as to this second question must

2  be "particularized." *Id*.  It is not enough that the general rule is established. *Id*.  Rather, "[t]he

3  relevant dispositive inquiry in determining whether a right is clearly established is whether it would

4  be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Id*. at

5  202 (emphasis added).  The Supreme Court has cautioned that courts should afford "deference to the

6  judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision." *Id*. at

7  205.

8         Applying the law of qualified immunity to the facts here, it is well-established that absent

9  exigent circumstances, the Fourth Amendment requires that a search warrant be obtained to enter a

10  private residence, as discussed above.  Further, there are many disputed facts relating to the question

11  of whether exigent circumstances existed when the Officers entered the Residence without a

12  warrant.  These disputed facts must be decided by a jury.   Therefore, the final step of qualified

13  immunity analysis must await the determination of issues of fact.   Accordingly, the Court denies

14  summary judgment on the basis of qualified immunity as to this claim.

15
16     **D.      Fourth Amendment Claim Based on Alleged Use of Excessive Force Against
                 Hemphill**

17         Defendants assert that Plaintiff Hemphill's excessive force claims against Officers Fletcher

18  and Khan fail as a matter of law because the force used was "clearly reasonable and the minimal

19  amount of force necessary in the face of Mr. Hemphill's resistance."  Motion at 16.  In any event,

20  Defendants assert, Officers Fletcher and Khan are entitled to qualified immunity on these claims

21  because they did not violate a clearly established right.  The Court rejects both contentions.

22         "A claim against law enforcement officers for excessive force is analyzed under the Fourth

23  Amendment's 'objective reasonableness' standard." *Arpin v. Santa Clara Valley Transportation*

24  *Agency*, 261 F.3d 912, 921 (9th Cir. 2001).  Determining whether the force used was reasonable

25  "requires careful attention to the facts and circumstances of each particular case, including the

26
27         [7] In *Pearson v. Callahan*, the Supreme Court clarified that the order of the two-step inquiry is
    not mandatory.  Rather, courts should "exercise their sound discretion in deciding which of the two
28  prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the
    particular case at hand."  --- U.S. ---, 129 S. Ct. 808, 818 (2009).

19

United States District Court

For the Northern District of California

1    severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

2    officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

3    *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "The reasonableness of a particular use of force must

4    be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

5    of hindsight."  *Id.*  Moreover, "'[n]ot every push or shove, even if it may later seem unnecessary in

6    the peace of a judge's chambers,' violates the Fourth Amendment."  *Id.*

7         There are disputed issues of material fact as to whether Officers Fletcher and Khan used

8    excessive force.  According to Hemphill, he was slammed onto the hood of a car during the course

9    of his arrest even though he was fully complying with the officers' orders and was not resisting

10   arrest.  According to Defendants, Hemphill was pushed against the hood of a car after he appeared to

11   be resisting arrest by flexing his arm muscles.  Whether the force used by the officers was

12   reasonable depends on whose account is to be believed – a question that the jury must decide.

13   Further, if the jury accepts Hemphill's account as true, the officers also are not entitled to qualified

14   immunity because it is clearly established that officers may not use more force than is reasonable

15   under the circumstances.  *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("In

16   assessing the state of the law at the time of [plaintiff's] arrest, we need look no further than

17   *Graham*'s holding that force is only justified when there is a need for force").

18        The Court denies Defendants' request for summary judgment on the excessive force claim.

19        **E.    Fourth Amendment Claims Based on Detention of Hoy and Silva**

20        Defendants assert that they are entitled to summary judgment as to Plaintiffs' claims that the

21   detention of Hoy and Silva violated their Fourth Amendment rights.  In the alternative, Defendants

22   assert that the Court should grant summary judgment on the basis that the Officers were entitled to

23   qualified immunity on these claims.  The Court concludes that Defendants are not entitled to

24   summary judgment on these claims on either ground.

25        As discussed above, the "Fourth Amendment does not bar police officers from making

26   warrantless entries and searches when they reasonably believe that a person within is in need of

27   immediate aid."  *Mincey v. Arizona*, 437 U.S. 385, 392 (1978).  Further, an emergency situation may

28   justify a warrantless seizure in the home.  *See Payton v. New York*, 445 U.S. 573, 587-88 (1980);

United States District Court

For the Northern District of California

*U.S. v. Walker*, 474 F.3d 1249, 1252-53 (10th Cir. 2007)).  However, "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey*, 437 U.S. at 393 (citing *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)).

In this case, it is undisputed that after Boo Boo was shot, Hoy was placed in handcuffs and taken outside, where he was put in the back seat of a patrol car.  It is also undisputed that the officers found Silva in her bedroom, where they placed her in handcuffs as well, and that she was then taken outside to a separate patrol car, where she also was put in the back seat.   According to Defendants, this detention was reasonable because of the officers' "inability to gain cooperation from the Residence's occupants."  Motion at 16.  Yet according to the accounts of the Plaintiffs, both Hoy and Silva were fully cooperative with the commands of the police officers.  Indeed, it is undisputed that Hoy immediately dropped to the ground when ordered to do so by the officers.  Further, Defendants have not cited to any testimony by the officers suggesting that they believed that Hoy or Silva posed a threat to the officers or would interfere with the officers' welfare check.  Nor do they cite any evidence indicating that Hoy and Silva were released as soon as the officers completed the welfare check of the house.  To the contrary, the undisputed evidence in the record indicates that Hoy and Silva were not released until sometime later, when each agreed to sign a statement drafted by the officers.  Under these circumstances, and drawing all reasonable inferences in favor of Plaintiffs, there is no basis for the Court to find, as a matter of law, that the detention of Hoy and Silva did not violate the Fourth Amendment.  Similarly, to the extent that it is well established that in an emergency situation detention of an individual in her residence without a search warrant is strictly circumscribed by the nature of the exigent circumstances – a question as to which the material facts are in dispute – Defendants also are not entitled to summary judgment on the basis of qualified immunity.[8]

---

[8]The Court notes that Defendants cite *Michingan v. Summers*, 452 U.S. 692 (1981) in support of the proposition that so long as a warrantless search is proper, in light of exigent circumstances, the police have "limited authority to detain the occupants of the premises while a proper search is conducted."  Motion at 13.  That case, however, is distinguishable from the facts here.  There, the Court addressed whether a pre-arrest detention of an individual in his residence, while officers were conducting a search at the individual's residence pursuant to a valid search warrant, violated the individual's Fourth Amendment rights.  The Court found that it did not, placing "prime importance" on

**United States District Court**
For the Northern District of California

**F.      Fourth Amendment Claim Based on Shooting of Boo Boo**[9]

Defendants assert that they are entitled to summary judgment on Plaintiff Silva's claim that the shooting of Boo Boo by Officer Sellers violated her Fourth Amendment rights because Officer Sellers' conduct was reasonable, as a matter of law.  Because key facts concerning the circumstances under which Officer Sellers shot Boo Boo are disputed, Defendants are not entitled to summary judgment on this claim.  Similarly, the Court is unable to determine whether Defendants are entitled to qualified immunity in light of these factual disputes.

In *San Jose Charter of the Hell's Angels Motorcycle Club v. City of San Jose*, the Ninth Circuit set forth the legal standard that applies where a dog has been killed in the course of a search or seizure:

> [T]he destruction of property by state officials poses as much of a threat, if not more, to people's right to be 'secure . . . in their effects' as does the physical taking of them." *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir.1994), *overruled on other grounds, Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir.2002) (citation omitted). "The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment" and can constitute a cognizable claim under § 1983. *Id.*  Reasonableness is the touchstone of any seizure under

the fact that a neutral magistrate had already found that there was probable cause to search the premises for suspected contraband. *Id.* at 701-702. Under these circumstances, the Court concluded, the intrusion was not unreasonable when balanced against the law enforcement interests of preventing flight if incriminating evidence was found and ensuring the safety of the officers conducting the search.  *Id.* Rather, the Court found that such a detention was within the exception articulated in *Terry v. Ohio*, 392 U.S. 1, 17 n.15 (1968), allowing an officer to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. *See Terry*, 490 at 30.  Even assuming that the holding of *Michigan v. Summers* applies to a detention within in a residence where the associated search was conducted *without* a warrant, Defendants have not argued, much less cited to any evidence suggesting that the officers suspected Hoy or Silva of committing any crime.  Moreover, as discussed above, Defendants have not pointed to any evidence that the officers  were concerned that either Hoy or Silva would harm the officers or flee the scene as a result of anything found  during the "search." Therefore, the rule articulated in *Michigan v. Summers* does not support Defendants' request for summary judgment on this claim.

[9]In their Opposition brief, Plaintiffs conceded that the claim asserted on the basis of Officer Sellers' shooting of Boo Boo was improperly asserted under the Fifth and Fourteenth Amendments and requested leave to amend the complaint to assert the claim under the Fourth Amendment.  Plaintiffs' request is GRANTED.  Although as a general rule, plaintiffs are not permitted to amend their complaints simply to evade summary judgment, that rule is not applicable here because Defendants have long been on notice that this claim is the "heart and soul" of this case.  In addition, Defendants were expressly instructed by the Court at the recent hearing on the Order to Show Case to address the Plaintiffs' claim under the Fourth Amendment in their Reply brief.  As result, Defendants are not prejudiced by allowing Plaintiffs to assert this claim under the Fourth Amendment.  Therefore, the Court concludes that it is in the interest of justice to permit Plaintiffs' to amend their complaint to add a Fourth Amendment claim based on the shooting of Boo Boo.  *See* Fed. R. Civ. P. 15(a)(2).

**United States District Court**
For the Northern District of California

1    the Fourth Amendment. . . . We look to the totality of the circumstances to determine
2    whether the destruction of property was reasonably necessary to effectuate the performance
     of the law enforcement officer's duties. See *Deorle*, 272 F.3d at 1279. "A seizure becomes
3    unlawful when it is 'more intrusive than necessary.' " *Ganwich*, 319 F.3d at 1122 (*quoting
     Florida v. Royer*, 460 U.S. 491, 504, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). To determine
4    whether the shooting of the dogs was reasonable, we balance "the nature and quality of the
     intrusion on the individual's Fourth Amendment interests against the countervailing
5    governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104
     L.Ed.2d 443 (1989) (citation and internal quotation marks omitted).

6    402 F.3d 962, 974 (9th Cir. 2005).

7        In *Hells Angels*, search warrants had been obtained to search the residences of Hell's Angels

8    members suspected of possessing evidence relevant to a murder. *Id*. at 966-967. For each residence,

9    an entry team and a search team was created. *Id*. The entry teams were given a week's notice to

10   plan the entries. *Id*. at 967. During that time, the entry teams gathered information and conducted

11   surveillance of the residences and on that basis, knew at the time of the searches that two of the

12   residences had or might have dogs on the premises. *Id*. at 968. The officers planned to either isolate

13   or kill the dogs upon entering the properties, but they made no specific plans to isolate the dogs or to

14   allow the residents to do so. *Id*. Nor did they consider using any form of non-lethal force to subdue

15   the dogs. *Id*. When the searches were conducted, the officers shot and killed dogs at both

16   residences – at one, a Rottweiler who was allegedly growling and advancing on the officers and at

17   another, two large Bullmastiffs who were barking loudly and would not retreat. *Id*. at 969.

18       The owners of the dogs in *Hells Angels* asserted claims under 42 U.S.C. § 1983, including a

19   claim under the Fourth Amendment, based on the shooting of the dogs. *Id*. at 965. Defendants

20   sought summary judgment on the claim on the basis of qualified immunity, which the was denied by

21   the district court. The Ninth Circuit affirmed, explaining its reasoning as follows:

22       Here, the intrusion was severe. The officers shot and killed one of Souza's dogs, and two of
         the Vieiras' dogs. We have recognized that dogs are more than just a personal effect. . . . The
23       emotional attachment to a family's dog is not comparable to a possessory interest in furniture.
         As noted in Lori Vieira's journal, the effect of her being handcuffed just yards from where
24       her dog Sam lay dead and bleeding was extremely traumatic. . . . Viewing the facts in the
         light most favorable to the Vieras and Souza, the seizures were unreasonable, in violation of
25       the Fourth Amendment. Most important, both entry teams had a week to plan the execution
         of the entry. At the Souza residence, despite advance knowledge of the presence of two guard
26       dogs, the full extent of the plan to protect the entry team from the dogs was to either "isolate"
         or shoot the dogs. The officers had no specific plan for isolating the dogs. At the Vieira
27       residence, Officer Nieves was in charge of handling the dogs. According to Officer Messier's
         declaration, "Officer Nieves was assigned to deal with dogs if there were any, which is why
28       he had a shotgun and was first in the stacking order. However, I did not give Officer Nieves

any specific instructions as to how to deal with any dogs." (emphasis added). Officer Nieves's "little plan" consisted of first hoping that the dogs would not appear at the gate. If they did, he planned to poke them through the fence with his shotgun to try and scare them. If that did not work, he planned to "engage". . . the dogs to ensure the safety of the entry team. In short, as the district court concluded, despite a week to plan for the entry, the officers developed no realistic plan other than shooting the dogs while serving the search warrants.

*Id*. at 975.  The Court went on to reject the defendants' arguments that killing the dogs advanced important governmental interests, namely, 1) allowing the officers to carry out the searches; 2) protecting the officers' ability to enter with stealth and speed;  and 3) ensuring the safety of the officers.  *Id*. at 976.   The Court noted that none of the individuals whose houses were being searched were suspects in the murder that was being investigated, that the need for stealth was not persuasive because it was the officers' own gunshots that woke residents, and that concern for the officers' safety did not make the conduct reasonable, given that the officers knew well in advance that they were likely to encounter the dogs and yet made no plan to protect themselves.  *Id*. at 977. The court noted, however, that the concern for officer safety might have been more persuasive if the officers had been unaware of the dogs at the time they entered the residences.  *Id*.

Defendants assert that the facts of *Hells Angels* are distinguishable from the facts here and therefore, that Officer Sellers could not "conceivably be liable" to Silva under the Fourth Amendment for shooting her dog.  Reply at 2.  In particular, Defendants point out that the entry in this case was in response to an emergency 911 call, in stark contrast to the facts in *Hells Angels*, in which the officers had an entire week to plan the entry and knew that they were likely to encounter large dogs that might pose a threat to the officers.  This distinction, however, does not persuade the court that the Officers' actions in this case were reasonable *as a matter of law*, or that they are entitled to qualified immunity on this claim.  There are conflicting accounts as to whether Boo Boo acted in a threatening manner.  If the jury credits Hoy's account that when he entered the living room Boo Boo was walking behind him in a manner that was not aggressive, and that he signaled to the officers to wait so that he could retrain Boo Boo, it may reasonably conclude that the Fourth Amendment was violated, especially in light of the undisputed facts that the officers did not ask Hoy or Silva at any time to restrain Boo Boo and that they were aware that there was a dog inside the house.  In any event, the existence of disputed material facts regarding the events that led up to Boo

1   Boo's shooting preclude summary judgment, either as to whether Defendants violated Silva's Fourth

2   Amendment rights or as to the question of qualified immunity on that claim.

3   **IV.     CONCLUSION**

4          For the reasons stated above, Defendants' Motion is GRANTED in part and DENIED in part.

5   In particular, the Motion is GRANTED as to all of Plaintiffs' claims against the City of San

6   Leandro, Police Chief Ian Willis and Officer Huckaby, as well as Plaintiffs' claims based on the

7   Fourteenth and Fifth Amendments.  The Motion is DENIED as to Plaintiffs' Fourth Amendment

8   claims based on the alleged unreasonable entry into the Residence, the alleged use of excessive force

9   against Hemphill, the alleged unreasonable detention of Hoy and Silva and the alleged unreasonable

10  shooting of Boo Boo, which shall proceed to trial.

11         IT IS SO ORDERED.

14  Dated: September 29, 2010

16                                              _____
                                                JOSEPH C. SPERO
17                                              United States Magistrate Judge

**United States District Court**
For the Northern District of California